# Illinois Official Reports

## Appellate Court

---

*Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369

---

| | |
|---|---|
| Appellate Court Caption | TERRY ARIENT, Independent Executor of the Estate of Kathy Arient, Deceased, Plaintiff-Appellee, v. YASSER ALHAJ-HUSSEIN, M.D., and ILLINOIS ANESTHESIA AND PAIN ASSOCIATES, S.C., Defendants-Appellants. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-2369 |
| Filed | December 1, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-14249; the Hon. Clare McWilliams, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | J. Timothy Eaton and Jonathan B. Amarilio, of Taft Stettinius & Hollister LLP, of Chicago, for appellants.<br><br>Robert J. Napleton and Bradley Z. Schulman, of Motherway & Napleton, of Chicago, and Lynn D. Dowd, of Naperville, for appellee. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justice Connors concurred in the judgment and opinion.<br>Justice Delort dissented, with opinion. |

**OPINION**

¶ 1        The defendants, Dr. Yasser Alhaj-Hussein (Dr. Hussein) and Illinois Anesthesia and Pain Associates, S.C. (IAPA), appeal from a $7,884,761.76 judgment entered against them in this medical negligence based action and the denial of their posttrial motion. In urging that the judgment be reversed and the case remanded for a new trial, the defendants argue, *inter alia*, that the trial court erred in (1) denying their motion *in limine* to bar the plaintiff from introducing evidence of Dr. Hussein's alleged lack of privileges to perform a celiac plexus block procedure on Kathy Arient at the Orland Park Surgical Center and overruling their objection to questions and argument addressed to the issue, (2) overruling their objection to a legal opinion rendered by one of the plaintiff's medical experts asserting a statutory requirement that a physician secure privileges prior to performing an operation at an ambulatory surgical center such as the Orland Park Surgical Center, and (3) granting the plaintiff's motion *in limine* which barred them from introducing evidence of, or making any reference to, Kathy Arient's smoking history. For the reasons which follow, we affirm the judgment of the trial court.

¶ 2        On October 5, 2012, Dr. Hussein performed a celiac plexus block procedure on Kathy Arient at the Orland Park Surgical Center. Following the procedure, Kathy Arient complained of numbness in her legs, and she was taken by ambulance to St. Joseph's Hospital where it was determined that she had experienced a vasospasm, resulting in paraplegia.

¶ 3        On December 19, 2012, Kathy Arient and her husband, Terry Arient, filed a two-count complaint against Dr. Hussein and other defendants in the circuit court of Cook County. Count I was a medical negligence action on behalf of Kathy Arient, and count II was a loss of consortium claim by Terry Arient. Both counts charged negligence on the part of Dr. Hussein in the performance of the celiac plexus block procedure.

¶ 4        Kathy Arient died on June 9, 2014. Her death certificate listed stroke as the cause of death. Her death was spread of record on July 7, 2014, and a second amended complaint was filed with leave of court on August 26, 2014. Terry Arient, as independent executor of the estate of Kathy Arient, deceased (hereinafter referred to as the plaintiff), was substituted as the plaintiff.

¶ 5        The plaintiff's complaint was further amended, with the final version being a four-count fourth amended complaint filed on July 20, 2015. Count I was a wrongful death action against Dr. Hussein and IAPA, his employer (hereinafter collectively referred to as the defendants), predicated on Dr. Hussein's alleged medical negligence in the performance of the celiac plexus block procedure, resulting in the death of Kathy Arient. Count II was a survival action against Dr. Hussein and IAPA, seeking recovery for the damages sustained by Kathy Arient prior to her death. Count III was a wrongful death action against Orland Park Surgical Center, LLC, charging institutional negligence resulting in the death of Kathy Arient. Count IV was a survival action against Orland Park Surgical Center, LLC, also charging institutional negligence. On December 18, 2015, the trial court entered an order granting Orland Park Surgical Center, LLC's motion to dismiss counts III and IV. No appeal has been taken from that order, and Orland Park Surgical Center, LLC, is not a party to this appeal.

¶ 6    The case proceeded against Dr. Hussein and IAPA on counts I and II of the fourth amended complaint which charged that Dr. Hussein was negligent in one or more of the following respects:

"a. Performed a celiac plexus neurolytic block with absolute alcohol even though it was not indicated; or

b. Injected absolute alcohol into the artery [of] Adamkiewicz or arteries that flow into the artery of Adamkiewicz; or

c. Failed to properly identify the landmarks during the performance of his [*sic*] celiac plexus neurolytic block; or

d. Failed to recommend and/or attempt to treat Kathy Arient's abdominal pain using more conservative therapeutic modalities such as an intrathecal spinal catheter pump; or

e. Failed to take a radiographic image after injecting dye in her spinal cord as part of a test dose prior to performing the celiac plexus neurolytic block; or

f. Failed to properly manipulate/position the spinal needle inserted into her spinal canal; or

g. Failed to possess privileges to perform celiac plexus block surgical procedures at Orland Park Surgical Center, or

h. Failed to possess the privileges to perform celiac plexus block procedures at any Illinois hospital."

According to the complaint, one or more of Dr. Hussein's alleged negligent acts or omissions proximately resulted in the death of Kathy Arient (count I) and the damages sustained by her prior to her death (count II).

¶ 7    Before the trial commenced, both the plaintiff and the defendants filed motions *in limine*, two of which are relevant to the issues on appeal. The plaintiff's motion *in limine* No. 12 sought to bar the defendants from introducing evidence of, or making any reference to, Kathy Arient's smoking history. The defendants objected, arguing that her smoking was "central to every issue in the case" and germane to the issue of proximate cause. They also argued that evidence of Kathy Arient's smoking was relevant as it would help explain why Dr. Hussein elected to administer a celiac plexus block to alleviate her chronic abdominal pain rather than prescribe opiate-based medicine or implant an intrathecal pump. The defendants referenced deposition testimony from Dr. Timothy Lubenow in which he stated that opiate tolerance is "a characteristic of patients that *** are chronic smokers" and that Kathy Arient's medical history suggests she was opiate tolerant. In addition, the defendants argued that Dr. Kenneth Candido testified during his deposition that patients such as Kathy Arient who suffer from Raynaud's disease are more susceptible to vasospasms if they continue using tobacco products. The defendants also filed a written offer of proof supported by excerpts from the deposition testimony of Drs. Candido, David Kuo, Lubenow, and Stephen Minore in addition to excerpts from the deposition testimony of both Kathy Arient and Terry Arient. According to the offer of proof, Kathy Arient's past medical history and history of smoking was relevant to the issues of whether Dr. Hussein deviated from the standard of care by recommending a celiac plexus block as opposed to alternative treatment modalities and whether any alleged breach of the standard of care by Dr. Hussein proximately caused Kathy Arient's death. The trial court granted the plaintiff's motion *in limine* No. 12 and stated, "Every time smoking is

invoked into a case it becomes a fatal issue to the plaintiff. *** So it's highly prejudicial. I almost never let it in unless it's a lung cancer case relating to smoking itself. I mean, a direct correlation."

¶ 8 The defendants' motion *in limine* No. 6 sought to bar the plaintiff from introducing any evidence addressed to Dr. Hussein's credentialing or surgical privileges. They asserted that the plaintiff's claim of negligence based on Dr. Hussein's alleged failure to possess privileges to perform a celiac plexus neurolytic block procedure at Orland Park Surgical Center was erroneously based upon section 6(3)(b) of the Ambulatory Surgical Treatment Center Act (Act) (210 ILCS 5/6(3)(b) (West 2012)). The defendants noted that, during his deposition, the plaintiff's expert witness, Dr. Minore, testified that Dr. Hussein deviated from the standard of care by failing to comply with section 6(3)(b) of the Act and argued that section 6(3)(b) was irrelevant because it "doesn't impose a duty upon a physician to do frankly anything." In response, the plaintiff advised the court that the privilege issue was one of the "main theories of [his] case." Then, citing Dr. Minore's deposition, the plaintiff argued that Dr. Hussein was not "privilege[d] for neurolytic" and that Illinois law "says you have to have like privileges at an Illinois certified hospital to perform a procedure at an Illinois licensed surgical center." The plaintiff maintained that the link "between the outcome and that deviation is [that Dr. Hussein] shouldn't have done the surgery in the first place because he was not privileged to do so at this outpatient surgical center," adding that "[i]t is a central theory of our case. He shouldn't have been doing the surgery because he didn't have privileges at this institution to do this *** procedure." In response to the arguments, the trial court stated "the law is the law. Let the jurors interpret it." The trial court went on to state that the accuracy of Dr. Minore's interpretation of the law was a matter for cross-examination. Thereafter, the court reserved ruling on the defendants' motion *in limine* No. 6.

¶ 9 Following jury selection, the parties gave their opening statements. The plaintiff's attorney told the jury:

"These procedures *** are so dangerous Dr. Minore will tell you and can be so—and can cause this type of damage that the privileges associated have to specifically say *** neurolytic blocks. That's what Dr. Minore is going to tell you, and you are going to see a credentialing file from [Orland Park Surgical Center] where the procedure was done that doesn't have that for Dr. Hussein. He doesn't—it doesn't have that—that credential to do this specific procedure at this specific institution and he did it anyway. Dr. Minore is going to tell you that a reasonably careful physician doesn't do procedures he is not privileged for which makes some sense."

Following these statements, the defendants made a standing objection to further comments about Dr. Hussein's privileges or credentialing. The trial court overruled the objection. The plaintiff's attorney continued on, stating that Dr. Hussein failed to "act as a reasonably careful physician by doing the procedure in the first place" because he lacked the requisite privileges.

¶ 10 As his first witness, the plaintiff called Dr. Hussein as an adverse witness. Dr. Hussein testified that he is board certified in both anesthesia and pain medicine. He stated that, on October 5, 2012, he performed a celiac plexus block procedure with absolute alcohol on Kathy Arient at the Orland Park Surgical Center. When he was questioned about his privileges at the Orland Park Surgical Center, defense counsel objected to the line of

- 4 -

questioning, but the objection was overruled. Dr. Hussein testified that he completed a credential application at Orland Park Surgical Center in 2012, listing his primary hospital as Riverside Medical Center in Kankakee, Illinois. He admitted, however, that at the time he completed the credential application, he was not privileged to provide either anesthesia services or pain management procedures at Riverside Medical Center. In response to questions concerning his treatment of Kathy Arient, Dr. Hussein stated that she was suffering from chronic abdominal pain. According to Dr. Hussein, he recommended the celiac plexus block because more conservative treatment for her abdominal pain had failed. He admitted that injecting absolute alcohol intravascularly can cause paraplegia and stated that he told Kathy Arient of the risks associated with a celiac plexus block on four separate occasions. He also admitted that injecting alcohol into an artery such as the Adamkiewicz artery would be a breach of the standard of care. Dr. Hussein testified that Kathy Arient's paraplegia was an unintended consequence of the celiac plexus block procedure, which would not have occurred if she had not undergone the procedure.

¶ 11   The plaintiff called Dr. Minore, an anesthesiologist and pain management physician, as an expert witness. Dr. Minore opined that Dr. Hussein breached the standard of care in his treatment of Kathy Arient by performing a celiac plexus block with absolute alcohol, failing to first implant an intrathecal pain pump instead of performing the celiac plexus block procedure, injecting alcohol into the Adamkiewicz artery or into one of the arteries leading to it, and failing to possess privileges to perform a celiac plexus block at the Orland Park Surgical Center. He testified that injecting alcohol into an artery or arterial wall can potentially result in paralysis. According to Dr, Minore, the celiac plexus block procedure performed by Dr Hussein caused Kathy Arient's paraplegia and contributed to her death.

¶ 12   The plaintiff's attorney asked Dr. Minore to "tell the jurors a little bit about [his] experience in credentialing pain management doctors in an outpatient facility." In responding, Dr. Minore stated:

> "When we credential someone for any surgical procedure at a surgery center, the legislator [*sic*] in Illinois in one of its few really good moves said that if a doctor practices in the surgery center, they have to have the same or like privileges in an Illinois licensed hospital. That's State law."

The defendants' attorney objected, stating: "I would object to this entire line. This witness is interpreting the law." The trial court overruled the objection, and Dr. Minore continued, stating, "You have to have the same privileges in the hospital to do them in a surgery center *** . It's a patient safety issue." Dr. Minore testified that he could find no evidence that Dr. Hussein was credentialed to perform a celiac plexus block at the Orland Park Surgical Center. When he was asked on cross-examination if he was interpreting an Illinois statute, Dr. Minore responded, "I read the law."

¶ 13   The plaintiff next called Dr. Zafer Jawich, an internist and one of Kathy Arient's treating physicians, as a witness. Dr. Jawich testified that he began treating Kathy Arient in 2008. At the time, she weighed approximately 124 pounds. However, by 2012, she was significantly underweight at 83 pounds. He stated that, although Kathy Arient had been treated by other physicians for pain management, she still suffered from chronic abdominal pain and requested that he recommend a pain management service. Dr. Jawich testified that he referred her to Dr. Hussein, who he had known for a number of years and who saw patients at his office on occasion. The plaintiff's attorney questioned Dr. Jawich about Dr. Hussein's

medical privileges over the defendants' objection. In response, Dr. Jawich related that he had unsuccessfully attempted to help Dr. Hussein obtain staff privileges at Silver Cross Hospital. He stated that, in September 2012, Dr. Hussein did not have privileges at Silver Cross Hospital, and he was unsure as to whether Dr. Hussein had staff privileges at St. Joseph Hospital.

¶ 14    In the midst of trial, the defendants moved the trial court to reconsider its order granting the plaintiff's motion *in limine* barring testimony about Kathy Arient's smoking. The motion was based upon the following questions asked of Dr. Hussein as an adverse witness concerning the predisposition of an individual, such as Kathy Arient, who has Raynaud's to suffer a vasospasm.

"Q. But an individual with Raynaud's disease is predisposed to a vasospasm not only in the periphery arteries, but also in the major vessels; isn't that true?

A. In the terminal arteries usually, but I don't know about the major vessels. Usually—

Q. If Dr. Candido, your expert, testifies that it limits circulation not only in the peripheral arteries but also in the major arteries, you would have no reason to disagree with him, correct?

A. I don't, to my knowledge it doesn't, but I would take his word."

The defendants argued that the questions misrepresented Dr. Candido's deposition testimony and were an improper attempt to use the order barring evidence of smoking "as both a sword and a shield." In support, they relied upon the following colloquy from Dr. Candido's deposition:

"Q. So folks with Raynaud's disease are predisposed to vascular spasm, is that a fair general statement?

A. Certainly, if they continue to consume tobacco products in spite of warnings not to do so, yes, tobacco and caffeine and stress can all be harbingers of an individual predisposed to having a vascular spasm as in the present case, that's correct."

According to the defendants, the plaintiff was "attempting to represent that Dr. Candido said that Raynaud's disease causes vasospasm," while at the same time "omitting what he actually said," namely, that people with Raynaud's are predisposed to vasospasms if they use tobacco products. Ultimately, the court denied Dr. Hussein's motion to reconsider its order.

¶ 15    The next medical expert testifying on behalf of the plaintiff was Dr. Kuo, a doctor of osteopathic medicine. He disagreed with the cause of death listed on Kathy Arient's death certificate. Dr. Kuo opined that that she died from a "failure to thrive" and repeated infections, resulting from her paraplegia, rather than from a stroke. He stated that, "as I stated in my deposition, there is no risk factor for a stroke. *** The patient had nothing. I mean, there's nothing that says the patient is a setup for stroke. I mean, that would be the farthest thing from my mind, a stroke."

¶ 16    At the conclusion of Dr. Kuo's testimony, the defendants again moved the trial court to reconsider its order barring testimony relating to Kathy Arient's smoking history, arguing that the order prevented them from both explaining the reason why Dr. Hussein recommended a celiac plexus block and presenting testimony that her smoking presented a risk factor for a stroke. They argued that, by eliciting testimony from Dr. Kuo that Kathy

Arient had no risk factors for a stroke, the plaintiff opened the door to the issue of her smoking. The defendants asserted that the trial court's order also prevented them from impeaching Dr. Kuo with his inconsistent deposition testimony in which he stated that smoking is a risk factor for a stroke and that it was his "understanding" that Kathy Arient continued smoking up to the day she died. The trial court denied the motion.

¶ 17      Before the plaintiff rested his case-in-chief, the defendants called Dr. Candido, a surgeon with a specialty in pain management, as an expert witness. Dr. Candido testified that he assisted in making credentialing decisions at the University of Illinois College of Medicine. He stated that Dr. Hussein was properly trained and privileged to perform celiac plexus block procedures and appeared to have such privileges at Sacred Heart Hospital. According to Dr. Candido, Dr. Hussein's pain management privilege card from Orland Park Surgical Center showed that he had privileges to perform the procedure at that facility.

¶ 18      Dr. Candido testified that a celiac plexus block is used to treat patients suffering from intractable abdominal pain such as Kathy Arient. He stated that Kathy Arient suffered from chronic pain for a number of years and that conservative treatment, including a spinal cord stimulator, had failed. He opined the Dr. Hussein's performance of a celiac plexus block with absolute alcohol was reasonable, medically necessary, and within the standard of medical care as Kathy Arient had "exhausted all other conventional methodologies." According to Dr. Candido, an intrathecal pump was not a reasonable treatment for Kathy Arient's condition for two reasons. First, another doctor had attempted to treat her using an implanted device, which ultimately required three implantation procedures and 17 revision surgeries. Dr. Candido explained that the necessity of 20 surgeries demonstrated ''the failure of implantable devices to modulate or mediate" her pain. Second, when Kathy Arient was treated by Dr. Hussein, she weighed only 83 pounds and was "extremely malnourished," so "[t]here would have been no place to place a pump."

¶ 19      Dr. Candido testified that Dr. Hussein properly positioned the spinal needles during the procedure. His review of the X-ray taken during the procedure showed the positions of the needles, which he stated were "placed in an ideal location for the procedure that's done behind the muscle of the diaphragm. This is *** classically placed—they're perfectly placed for that procedure." When asked whether Dr. Hussein injected absolute alcohol into an artery, Dr. Candido stated, "[a]bsolutely not. No way." He explained that, if Dr. Hussein penetrated an artery, a contrast agent injected during the procedure that was visible on X-ray photographs taken throughout the procedure would have dissipated and not been visible. Dr. Candido noted that four X-rays taken during the procedure showed the contrast "hugging the vertebral body," explaining that, "if we had been in an artery, [the contrast] would have gone like a swoosh and dissipated very rapidly because it mixes with that rapidly flowing blood."

¶ 20      It was Dr. Candido's opinion that Kathy Arient suffered a vasospasm which is a "reduction in the diameter or lumen of a vessel," also known as an ischemic stroke, in the Adamkiewicz artery. He explained that, when the Adamkiewicz artery "goes into spasm, it reduces blood flow to the spine," which results in oxygen deprivation to the spine. According to Dr. Candido, the vasospasm which Kathy Arient suffered was "sufficient to cause a reduction in blood flow from one major arterial structure backwards toward her spine," resulting in paraplegia. He stated that "just going next to an artery with either a clamp or clamping the artery can result in such severe vasospasm that the reduction in blood flow leads to an ischemic event." He opined, to a reasonable degree of medical certainty, that

Kathy Arient's vasospasm was caused when the needle or alcohol used during the procedure approached the Adamkiewicz artery. He also testified that Kathy Arient had Raynaud's disease and that "people who have a history of Raynaud's are more prone to vasospasm under certain circumstances."

¶ 21    Following Dr. Candido's testimony, the plaintiff resumed his case-in-chief. He called Dr. Lubenow, an anesthesiologist and one of Kathy Arient's treating physicians, as an expert witness. He testified that he trained Dr. Hussein in pain management procedures, including the celiac plexus block. Dr. Lubenow was questioned regarding his own staff privileges. The defendants objected to the line of questions. Their objection was overruled, but the trial court stated that it would not permit Dr. Lubenow to testify that Dr. Hussein breached the standard of care by failing to have privileges to perform a celiac plexus block procedure at Orland Park Surgical Center.

¶ 22    Dr. Lubenow testified that he treated Kathy Arient for abdominal pain between November 2010 and August 2012. He stated that he prescribed opiate based medication, which afforded her temporary relief. He admitted, however, that the treatment failed as it only provided relief for two weeks. He stated that he continued to treat Kathy Arient with oral opioid medications but acknowledged that she had developed a tolerance to the medications. According to Dr. Lubenow, in August 2012, he discontinued treatment with opiate medication and recommended a pain pump as an option. On cross-examination, he testified that a pain pump is no smaller than the spinal stimulator, which Kathy Arient's body had rejected. Dr. Lubenow described Kathy Arient's body weight as "cachectic" and admitted that her weight was a mitigating factor against implanting a pain pump. He also admitted that paralysis was a risk associated with implanting a pain pump. Dr. Lubenow testified that implanting any device in a reluctant patient would be a breach of the standard of care.

¶ 23    After the plaintiff rested, Dr. Hussein again testified. He described his initial consultation and treatment of Kathy Arient. He related her medical history and the failure of earlier treatments to relieve her abdominal pain. According to Dr. Hussein, Kathy Arient had "no interest" in undergoing the implantation of any device such as a pain pump after having had multiple failed spinal stimulator surgeries. He also stated that she had taken extremely high doses of oral opioid medication without lasting relief.

¶ 24    Dr. Hussein described a celiac plexus block procedure. He stated that, in performing the procedure on Kathy Arient, he did not inject absolute alcohol into an artery as evidenced by X-rays, which were taken throughout the procedure. According to Dr. Hussein, he believed that the procedure triggered a blood vessel spasm, which was a known risk, resulting in Kathy Arient's paraplegia. Dr. Hussein opined that Kathy Arient was a candidate for a celiac plexus block procedure and that his surgical technique complied with the standard of care.

¶ 25    On cross-examination, the plaintiff's counsel returned to the issue of Dr. Hussein's privileges to perform a celiac plexus block procedure at Orland Park Surgical Center. On the topic of Dr. Hussein's privileges at Sacred Heart Hospital, the plaintiff's counsel inquired as to whether Sacred Heart Hospital had been closed due to Medicare fraud. The trial court sustained the defendants' objection to the question but denied their motion for a mistrial.

¶ 26    Following the close of evidence, the trial court conducted an instruction conference. During the conference, the plaintiff submitted the following instruction:

"There was in force in the State of Illinois at the time of the occurrence in question certain statutes which provided that:

No physician shall be permitted to perform surgical procedures at an outpatient surgical facility unless he or she possesses staff privileges to perform surgical procedures at least one Illinois hospital."

The defendants objected to the instruction, arguing that it was a misrepresentation of section 6(3)(b) of the Act, as the statute did not place an obligation upon Dr. Hussein to obtain privileges prior to performing a celiac plexus block on Kathy Arient at Orland Park Surgical Center. The court rejected the plaintiff's proffered instruction, explaining, "it is really a statute that goes to the director. And the director [is] defined within the statute [as] the State of Illinois or the director of public health[,] I believe. It really puts no duty or onus on a [physician]." Thereafter, however, the court declined a request by Dr. Hussein to tender a curative instruction on the privilege issue.

¶ 27    After the instruction conference, the parties made their closing arguments. During his closing argument, the plaintiff's counsel twice declared that Dr. Hussein "didn't have the right" to perform a celiac plexus block with absolute alcohol because he "wasn't specifically privileged." He later returned to that point by analogizing medical privileges to a driver's license: "[Dr. Hussein] flat out did not have the privileges ***. It's like a driver's license. You're privileged to be on the roads of the State of Illinois. It's not a right." He then reiterated that Dr. Hussein "didn't have the right" to do the procedure "on that day anywhere in the State of Illinois." In his initial closing argument and rebuttal, the plaintiff's counsel continuously stressed the issue of Dr. Hussein's alleged lack of privileges to perform a celiac block procedure at the Orland Park Surgical Center.

¶ 28    Following closing argument, the jury was instructed, *inter alia*, that the plaintiff claimed that Kathy Arient was injured and died and that Dr. Hussein was "negligent in one or more of the following respects:

"a. Performed a celiac plexus neurolytic block with absolute alcohol even though it was not indicated; or

b. Failed to recommend and/or attempt to treat Kathy Arient's abdominal pain using more conservative therapeutic modalities such as an intrathecal spinal catheter pump; or

c. Injected absolute alcohol into the artery of Adamkiewicz or arteries that flow into the artery of Adamkiewicz; or

d. Failed to possess privileges to perform a celiac plexus block with absolute alcohol; or

e. Failed to place the spinal needles in front of the L1 vertebral body."

The jury was further instructed that one or more of the negligent acts or omissions attributed to Dr. Hussein proximately caused Kathy Arient's injury and death.

¶ 29    Following their deliberations, the jury returned a $7,884,761.76 verdict in favor of the plaintiff and against the defendants, and the trial court entered judgment on the verdict.

¶ 30    The defendants filed a posttrial motion seeking a new trial. They asserted error on the part of the trial court in, among other matters, permitting the plaintiff to raise the issue of Dr. Hussein's medical privileges and barring them from introducing evidence of, or making any

reference to, Kathy Arient's smoking history. The trial court denied the defendants' posttrial motion, and this appeal followed.

¶ 31 For their first assignment of error, the defendants argue that the trial court abused its discretion by permitting evidence addressed to Dr. Hussein's privileges to perform a celiac plexus block procedure to be heard and considered by the jury, an error which was compounded by (1) overruling their objection to Dr. Minore's legal opinion on the issue and (2) refusing to give a curative instruction after acknowledging that there is no statute placing a duty on the part of a physician to obtain privileges before performing the celiac plexus block procedure at an ambulatory surgical center. We agree.

¶ 32 "[T]he admissibility of evidence is a matter for the sound discretion of the trial court, and its decision will not be reversed on appeal unless that discretion has been clearly abused." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995). An abuse of discretion occurs when the court's decision is "arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. We believe that, in this case, the trial court abused its discretion when it denied the defendant's motion *in limine* No. 6 and thereafter permitted evidence of, and argument addressed to, Dr. Hussein's privileges to perform a celiac plexus block at the Orland Park Surgical Center.

¶ 33 During the hearing on the defendants' motions *in limine* No. 6, Dr. Hussein specifically argued that the introduction of evidence addressed to his privileges was both irrelevant and predicated on a misinterpretation of section 6(3)(b) of the Act. We agree. As the Act's title suggests, its purpose is to regulate ambulatory surgical treatment centers. Section 2 of the Act provides that the statute's purpose is to protect the public health by developing, establishing, and enforcing standards "(1) for the care of individuals in ambulatory surgical treatment centers, and (2) for the construction, maintenance and operation of ambulatory surgical treatment centers." 210 ILCS 5/2 (West 2012). To further that purpose, the Act sets forth a licensing requirement for ambulatory surgical treatment centers. See 210 ILCS 5/4 (West 2012). Section 6 of the Act contains a detailed set of requirements which must be met before the Director of Public Health may issue a license. 210 ILCS 5/6 (West 2012). By its plain language, the Act regulates ambulatory surgical treatment centers and not individual physicians. To be sure, certain sections of the Act, such as section 6(3)(b), do refer to individual physicians. However, as the statute's text makes clear, those references to individual physicians do not manifest a legislative intent to regulate individual physicians. Rather, they simply recognize that, to treat patients, ambulatory surgical treatment centers must act through individual physicians.

¶ 34 Clearly, statutes or ordinances "designed to protect human life or property" may be used to establish the standard of conduct required of a reasonable person. *Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121, 130 (1997). As the trial court belatedly recognized, however, section 6(3)(b) of the Act places no privilege obligations on individual physicians such as Dr. Hussein, and therefore, the statute could not form the foundation for the relevancy of evidence addressed to Dr. Hussein's privileges. The question remains, however, whether Dr. Hussein's privileges to perform a celiac plexus block procedure at the Orland Park Surgical Center, or lack thereof, was relevant to any issue in controversy.

¶ 35 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). In an action grounded in allegations of medical negligence, the "plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes*, 193 Ill. 2d 433, 443-44 (2000). In this case, there is no statute which required Dr. Hussein to obtain privileges before performing a celiac block procedure on Kathy Arient, and the plaintiff never alleged that Dr. Hussein lacked the competence to perform a celiac plexus block procedure, only that he did so negligently. Whether Dr. Hussein did, or did not, possess privileges to perform a celiac plexus block procedure at the Orland Park Surgical Center does not tend to make the allegation that he deviated from the standard of care in the performance of the procedure on Kathy Arient more or less probable. Consequently, evidence addressed to Dr. Hussein's privileges was irrelevant to the issue of whether he deviated from the standard of care in his treatment of Kathy Arient, and should not have been admitted.

¶ 36 The trial court's error in admitting evidence addressed to Dr. Hussein's privileges was compounded by its having overruled the defendants' objection to Dr. Minore's testimony asserting a statutory requirement that a physician obtain privileges before performing a celiac plexus block procedure at an ambulatory surgical center. When Dr. Minore testified to the alleged statutory requirement, he was providing a legal opinion. His testimony in this regard was inadmissible for several reasons. First, expert testimony is admissible only if the expert possesses "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Ill. R. Evid. 702 (eff. Jan. 1, 2011). There is no evidence in this record establishing Dr. Minore's specialized knowledge as to the requirements of Illinois law. Second, it is the duty of the trial court to decide the legal issues. The trial court instructs the jury as to the law, and no expert is allowed to opine as to the law; that is the role of the trial court. *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800-01 (2009). "Statutory interpretation is not a matter to which an expert witness is competent to testify." *Christou v. Arlington Park-Washington Park Race Tracks Corp.*, 104 Ill. App. 3d 257, 261 (1982). Contrary to the trial court's reasoning, the accuracy of Dr. Minore's interpretation of Illinois law was not a matter for cross-examination; it never should have been allowed in the first place. Compounding the error even further, the trial court refused to give a curative instruction once it finally realized that there is no statutory requirement that a physician obtain privileges prior to performing a celiac plexus block at an ambulatory surgical treatment center such as the Orland Park Surgical Center.

¶ 37 Next, the defendants argue that the trial court abused its discretion by granting the plaintiff's motion *in limine* No. 12 and prohibiting them from eliciting testimony concerning Kathy Arient's history of smoking. Again we agree.

¶ 38 As noted earlier, in granting the plaintiff's motion *in limine* No. 12 and barring the defendants from eliciting testimony concerning Kathy Arient's history of smoking, the trial court stated, "I almost never let it in unless it's a lung cancer case relating to smoking itself. I mean, a direct correlation." We find that barring this evidence was erroneous for two reasons. First, whether evidence is admissible does not hinge on whether it has a "direct correlation" to the issues in controversy. Rather, evidence is admissible if it is relevant; that is to say, if it has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

- 11 -

evidence." (Emphasis added.) Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). In this case, the defendants responded to the plaintiff's motion *in limine* No. 12, arguing that Kathy Arient's smoking was relevant to Dr. Hussein's decision to recommend a celiac plexus block instead of other treatment modalities. They explained that Kathy Arient had a long history of treatment with opioid painkillers and that her medical records suggested that she developed a tolerance to opioid drugs, which is common in chronic smokers. The defendants also argued that individuals, such as Kathy Arient, who suffer from Raynaud's disease are more susceptible to a vasospasm if they are smokers. The defendants supported their arguments with a written offer of proof, which contained excerpts from the discovery depositions of Drs. Candido, Kuo, Lubenow and Minore, in addition to excerpts from the deposition testimony of both Kathy Arient and the plaintiff. The offer of proof clearly established the relevance of Kathy Arient's smoking to the issue of whether Dr. Hussein deviated from the standard of care by recommending a celiac plexus block as opposed to alternative treatment modalities.

¶ 39    Second, the record reveals that the trial court made a determination that the probative value of evidence of Kathy Arient's smoking was outweighed by its prejudicial effect. Under Illinois Rule of Evidence 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by," among other things, "the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). "In this context, prejudice means 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.' " *People v. Eyler*, 133 Ill. 2d 173, 218 (1989) (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984)); *People v. Prather*, 2012 IL App (2d) 111104, ¶ 24. In this case, there is nothing in the record that could have supported a finding that evidence of Kathy Arient's smoking would have induced the jury to decide the case based upon hatred, contempt, or horror. Instead the trial court applied a blanket, bright-line rule under which smoking evidence is admissible only if it has a "direct correlation" to the case, such as a case involving lung cancer. Such reasoning is incompatible with Rule 403, which requires a fact-intensive balancing to determine if the evidence's probative value is *substantially* outweighed by its *unduly* prejudicial effect. *Petraski v. Thedos*, 382 Ill. App. 3d 22, 32 (2008); *Rush v. Hamdy*, 255 Ill. App. 3d 352, 366 (1993) (finding that the trial court abused its discretion by granting motion *in limine* because the "the prejudicial effect" of the evidence did not "*substantially* outweigh" its probative value (emphasis in original)). In light of the foregoing, we find that the court abused its discretion by granting the plaintiff's motion *in limine* No. 12 and barring the defendants from introducing evidence of Kathy Arient's smoking history.

¶ 40    Moreover, even assuming, for the sake of analysis only, that the trial court's decision to grant the plaintiff's motion *in limine* No. 12 was correct when initially made, the trial court abused its discretion when it denied the defendants' motions to reconsider the order. Barring the defendants from eliciting evidence of Kathy Arient's smoking enabled the plaintiff to suggest that Dr. Candido was of the opinion that Kathy Arient's Raynaud's disease, standing alone, predisposed her to a vasospasm when his deposition revealed that he was actually of the opinion that individuals with Raynaud's disease are predisposed to vasospasm if they use tobacco. In addition, the barring order prevented the defendants from impeaching Dr. Kuo, who testified that Kathy Arient had no risk factors for a stroke, with his deposition during

which he stated that smoking is a risk factor for a stroke and it was his understanding that Kathy Arient continued smoking until the day of her death.

¶ 41 The trial court's errors in barring the defendants from eliciting evidence of Kathy Arient's smoking directly hampered their ability to defend against two of the allegations of negligence alleged by the plaintiff and contained in the issues instruction given to the jury—namely, that Dr. Hussein performed a celiac plexus block with absolute alcohol when it was not necessary and that he failed to recommend and/or attempt to treat Kathy Arient's abdominal pain using more conservative modalities. By permitting the plaintiff to introduce irrelevant evidence addressed to Dr. Hussein's privileges, the trial court enabled the plaintiff to place before the jury the allegation that Dr. Hussein's performance of a celiac plexus block in the absence of privileges to perform the procedure was a breach of the standard of care which, standing alone, proximately caused Kathy Arient's injury and death.

¶ 42 In this case, however, the jury was instructed that the plaintiff claimed that Dr. Hussein was negligent in one or more of five enumerated acts or omissions, proximately resulting in Kathy Arient's injury and death. The allegations of negligence were asserted in the disjunctive. And although the evidentiary errors noted were prejudicial and directly affected three of those allegations of negligence, the errors do not directly impact the remaining two allegations of negligence on the part of Dr. Hussein in the performance of the celiac plexus block procedure on Kathy Arient, namely, his having injected absolute alcohol into an artery and having failed to place the spinal needles in front of the L-1 vertebral body.

¶ 43 Nevertheless, the defendants argue that the trial court's abuse of discretion in barring them from introducing evidence of Kathy Arient's smoking had a prejudicial effect upon their ability to defend against all five of the negligent acts or omission charged. They correctly assert that they have "the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of [the] plaintiff's injuries." *Leonardi*, 168 Ill. 2d at 101. However, the record before us fails to reflect that the defendants ever asserted that Kathy Arient's smoking was the sole proximate cause of her death. They argued that smoking was relevant to Dr. Hussein's election to perform a celiac plexus block as opposed to other treatment modalities. In addition, they argued that Kathy Arient's smoking predisposed her to a vasospasm and was a risk factor for stroke and submitted deposition testimony in support of the arguments with their written offer of proof; but they never argued or made an offer of proof that, if allowed, they were prepared to present evidence that Kathy Arient's smoking was the sole proximate cause of her vasospasm, which resulted in paraplegia, or that smoking was the sole proximate cause of the stroke which led to her death. At best, the defendants made a passing reference to the issue in their written offer of proof when they stated, "A related issue is whether Dr. Hussein' alleged breach of his standard of care proximately caused Mrs. Arient's death." Although defendants wishing to contest causation must be allowed to introduce the evidence they have on the issue of proximate cause (*Nolan v. Weil-McLain*, 233 Ill. 2d 416, 442 (2009)), in this case, there is nothing in the record supporting a conclusion that the defendants pursued, or intended to pursue, a sole proximate cause defense based upon Kathy Arient's smoking. Although the defendants asserted that they were prepared to offer evidence that Kathy Arient's smoking predisposed her to a vasospasm and was a risk factor for a stroke, that evidence would not have negated Dr. Hussein's alleged negligence in having injected absolute alcohol into an artery or having failed to place the spinal needles in front of the L-1

vertebral body as a proximate cause of Kathy Arient's injury and death. To support a verdict in a negligence action, a defendant's actions need not be the *only* cause of an injury, it is sufficient if they are *a* cause. *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57 (2000). In the absence of any indication that, but for the trial court having barred them from introducing evidence of Kathy Arient's smoking history, the defendants were prepared to introduce expert medical evidence that her smoking history was the sole proximate cause of her paraplegia or stroke, the trial court's errors in barring the defendants from introducing evidence of smoking did not prevent them from defending against the allegations that Dr. Hussein was negligent by injecting absolute alcohol into an artery or in his placement of the spinal needles. They, in fact, defended against the allegations by denying that they occurred. The defendants presented the testimony of Dr. Candido, who testified that Dr. Hussein did not inject absolute alcohol into Kathy Arient's artery and opined that the spinal needles "were perfectly placed for that procedure."

¶ 44 Were we writing on a clean slate, we might well agree with the defendants' argument that the quantum of the error in this case warrants a new trial. However, in *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987), the supreme court reaffirmed the general verdict rule, holding that "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain." In addition, section 2-1201(d) of the Code of Civil Procedure provides, in pertinent part, that "[i]f several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict." 735 ILCS 5/2-1201(d) (West 2012).

¶ 45 In this case, the jury returned a general verdict, and because the defendants did not submit special interrogatories, we have no way of knowing upon which of the acts of negligence alleged against Dr. Hussein the jury based its verdict. Our earlier analysis leads us to conclude that the trial court's evidentiary errors in no way hampered the defendants from presenting a defense on two of the acts of negligence charged against Dr. Hussein, and the defendants have not argued that the jury's verdict was in any respect against the manifest weight of the evidence. We, therefore, apply the general verdict rule and affirm the judgment of the trial court.

¶ 46 Affirmed.

¶ 47 JUSTICE DELORT, dissenting:

¶ 48 I agree with the majority that the circuit court erroneously admitted evidence about Dr. Hussein's privileges (or lack thereof) to perform a celiac plexus block with absolute alcohol and that it improperly precluded Dr. Hussein from introducing evidence about Kathy Arient's history of smoking. I thus join paragraphs 1 through 41 of the majority opinion in full. But the majority concludes that notwithstanding those errors, Dr. Hussein is not entitled to any relief. This conclusion is based on what has come to be known as the "general verdict rule," described by the Illinois Supreme Court in *Witherell v. Weimer*, 118 Ill. 2d 321 (1987), and codified by the General Assembly in section 2-1201(d) of the Code of Civil Procedure. See 735 ILCS 5/2-1201(d) (West 2012). Because neither section 2-1201(d)'s plain text nor

decisions of our supreme court—*Witherell* included—justify applying that rule under the facts of this case, I respectfully dissent.

¶ 49   Section 2-1201(d) provides:

"If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is *sufficient* to sustain the verdict." (Emphasis added.) 735 ILCS 5/2-1201(d) (West 2012).

The italicized word, "sufficient," makes the difference here. Dr. Hussein claims that he was denied his right to a fair trial. A " 'fair trial' " is " 'a trial whose result is reliable.' " *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *People v. Manning*, 241 Ill. 2d 319, 330 (2011). The converse is also true; a trial that is unfair cannot produce a reliable result. A verdict produced from a trial that is fundamentally unfair due to evidentiary errors does not produce a fair and proper determination of the rights, responsibilities, and liabilities of the parties involved.

¶ 50   All of the plaintiff's claims were presented to a single jury in a single, unitary proceeding—not piecemeal. Where, as here, enough irrelevant, prejudicial, and inflammatory evidence is admitted in error, the error affects the entire trial. And if the error infects the entire trial, then there can be no basis to sustain the verdict.

¶ 51   Indeed, in *Sims v. Chicago Transit Authority*, 7 Ill. App. 2d 21 (1955), this court stated:

"A court of review assumes, as it must, at least one important proposition when it invokes [the general verdict rule]. It assumes that the intelligence of the jurors enabled them to discriminate between those counts or issues proved and those unproved, [citation], *and that the error below was not of such a character as could have reasonably affected their ability to discriminate intelligently*." (Emphasis added.) *Id.* at 28.

In other words, when the error in question is not so severe as to call into question whether the jury was able to reach a verdict based only on the properly admitted evidence, the general verdict rule may be applied. But *Sims* and our supreme court suggest that the opposite is equally true: when an error is so severe as to call into doubt whether or not the jury was able to disregard the error and reach a competent verdict, the general verdict rule should not apply. See *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 102 (2010) (noting that the general verdict rule is only a presumption).

¶ 52   Though it is not a general verdict rule case, *Jackson v. Pellerano*, 210 Ill. App. 3d 464 (1991), illustrates the point. In *Jackson*, the plaintiff's husband, Ken Jackson, was involved in a single car accident. Ken was taken to the hospital, where he eventually died. His wife then filed a medical malpractice lawsuit against Ken's doctors. *Id.* at 465-67. Before trial, the plaintiff filed a motion *in limine* to preclude the defense from introducing evidence regarding Ken's possible intoxication at the time of the accident. The court denied the motion, and at trial, the defense introduced evidence suggesting Ken was intoxicated at the time of the accident, including testimony from one of Ken's treating paramedics, who testified that Ken "was unruly and combative and told him he had been drinking heavily prior to the accident." *Id.* at 468-69. The jury ultimately returned a verdict for the defense.

¶ 53 On appeal, the plaintiff argued that she was entitled to a new trial because the court erroneously admitted evidence about Ken's intoxication. This court agreed, finding that this evidence was "irrelevant and inflammatory." *Id.* at 472. More importantly, the court expressly rejected the defense's argument that the intoxication did not influence the verdict because the plaintiff was able to respond to the evidence at trial, stating, "simply because plaintiff was able to diffuse several instances of inflammatory evidence produced by defendants does *not mean that the jury was not improperly influenced by such evidence*." (Emphasis added.) *Id.* at 471-72.

¶ 54 Kathy's smoking was arguably relevant to only some of Terry's claims against Dr. Hussein, but all of the claims shared the common premise of whether Dr. Hussein performed medical services in a manner consistent with the standard of care. The admission of improper privileges evidence tainted every claim with an indelible stain of illegality. As a result, there was no "one good count" creating "grounds *** sufficient to sustain the verdict."

¶ 55 Section 1-106 of the Code supports this conclusion. That section provides, "[t]his Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties." 735 ILCS 5/1-106 (West 2012). This court has interpreted section 1-106 as a command to liberally construe the Code and its individual provisions "to fulfill its purpose of *providing substantial justice* and resolution on the merits, rather than imposing seemingly insurmountable procedural obstacles to litigation." (Emphasis added.) *Doe v. Montessori School of Lake Forest*, 287 Ill. App. 3d 289, 296 (1997).

¶ 56 Here, rigidly applying section 2-1201(d) to defeat Dr. Hussein's fair trial claim fails to achieve substantial justice. To be sure, as plaintiff, Terry was *also* entitled to a fair trial. He received all that and more: he was permitted to label Dr. Hussein a criminal for the mere act of performing the procedure at issue. Under these circumstances, application of the substantial justice standard militates decisively against an interpretation of section 2-1201(d) which would allow the verdict to stand.

¶ 57 I have been unable to find a decision from our supreme court or from any panel of the appellate court invoking the general verdict rule to defeat an unfair trial claim. (Terry neither cited such a case in his appellate brief, nor did he bring one to this court's attention at oral argument.) Illinois courts apply the general verdict rule when the jury returns a general verdict and the defendant raises an argument on appeal germane to one, but not all, of the plaintiff's theories of relief. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002), illustrates the distinction.

¶ 58 In *Dillon*, the plaintiff sued a doctor and a hospital asserting numerous theories of liability under the rubric of medical negligence. *Id.* at 487. Later, the plaintiff filed an amended complaint, which added as a theory of relief a claim for negligent insertion of a catheter. *Id.* at 490. The case then proceeded to a jury trial, which resulted in a verdict for the plaintiff. *Id.* at 488-89.

¶ 59 On appeal, the defendants argued, among other things, that the entire verdict should be set aside because the new claim in the amended complaint was untimely. *Id.* at 489. The supreme court disagreed, explaining, "[b]ecause [defendants] did not submit special interrogatories, there is no way of knowing on what theory the jury found defendants negligent." *Id.* at 492. In other words, because the defendants' argument that the new claim in the amended complaint was untimely was only relevant to that specific claim and did not

in any way affect the plaintiff's other timely claims, the defendant's argument could not provide sufficient ground to disturb the jury's verdict. See *id.*

¶ 60    *Witherell*, 118 Ill. 2d 321, is not to the contrary. The majority correctly cites *Witherell* for the proposition that, "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain." See *supra* ¶ 44 (quoting *Witherell*, 118 Ill. 2d at 329). But *Witherell* is factually inapposite because it did not involve a fair trial claim, so I do not believe that it controls the present case.

¶ 61    In any event, Dr. Hussein could not have propounded a proper special interrogatory to test the impact of Terry's privileges evidence on the jury's deliberations. "A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). None of Terry's privileges evidence—not Dr. Minore's legal opinion testimony about the Act, not the numerous colloquies about privileges elicited by Terry at trial, not Terry's repeated insinuations of criminality against Dr. Hussein—was in any way relevant to any issue in the case. As a result, there is no way Dr. Hussein could have propounded a special interrogatory asking the jury to delineate the impact of this testimony on its deliberations. Since Dr. Hussein's privileges were not relevant, they could not have formed the basis of an ultimate issue of fact at trial. The circuit court would have thus been bound to reject such a special interrogatory had one been propounded.

¶ 62    I respectfully dissent from the majority's application of the general verdict rule to this case. I would instead reverse and remand for a new trial.